UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| IN RE: | |
| ANTHONY ROBERTS<br>ELITA ROBERTS | CASE NO.: 10-31154(1)(7) |
| _____Debtors_____ | |
| JAMES ATKISSON | AP NO.: 10-03043 |
| Plaintiff | |
| vs. | |
| ANTHONY ROBERTS | |
| _____Defendant_____ | |

## MEMORANDUM-OPINION

This matter came before the Court for trial on the Complaint of Plaintiff James Atkisson ("Atkisson") against Defendant/Debtor Anthony Roberts ("Debtor"). The Court considered the testimony of the witnesses and the documentary evidence submitted. For the following reasons, the Court will enter the attached Judgment in favor of the Debtor. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**FINDINGS OF FACT**

Atkisson owned a company called Diversified Financial Group, Inc. ("Diversified") which sold financial and investment planning products. He first met Debtor while he was a property and casualty agent with Allstate Insurance Company. Debtor had an independent agency that he owned with Michael Bush called Commonwealth Risk Management, LLC ("Commonwealth").

In 2008 Debtor approached Atkisson about buying into Diversified because he was dissatisfied with Allstate. Atkisson and Debtor agreed that Debtor would purchase part of Diversified for $108,000. This money was to be used as seed money to grow the company. Atkisson testified that the money Debtor put into Diversified was to be used to pay expenses and that Debtor would obtain stock in Diversified from his own sweat equity.

In order to obtain the seed money to put into Diversified, Debtor had to sell Commonwealth. In the fall of 2008, Jessica Wagner agreed to purchase Commonwealth from Debtor. Wagner's original financing for the purchase fell through and Debtor told her he could carry the Note on Commonwealth while she obtained new financing. Debtor made two payments of $5,669 each on the Note before Wagner obtained the new financing. Wagner paid these payments to Debtor and Debtor put these funds into Diversified. Wagner ultimately obtained financing and paid $108,537 to complete the sale transfer with Debtor.

In September 2008, Atkisson gave Debtor a company credit card for use in the business of Diversified. Debtor testified he was given no instructions regarding the use of the credit card. Although Debtor was an officer of Diversified at the time he was issued the credit card, Atkisson personally guaranteed the debt on the card.

Debtor's role at Diversified was to generate new business. Debtor was a licensed insurance agent and Atkisson had experience with equities.

At the time of the sale of Commonwealth, Debtor had deferred lease payments on his Allstate office until the sale to Wagner was consummated. Debtor had also received money from his mother's IRA. These debts had to be repaid before the deal with Wagner could close. Atkisson acknowledged at trial that he agreed to pay these debts in order to get the deal closed.

Atkisson and Debtor originally devised a plan where each would get draws from Diversified. Debtor began receiving draws from Diversified in August 2008. In the fall of 2008, Debtor brought $17,000 in commissions that he contributed to Diversified. He also rolled over a $25,000 commission from Commonwealth before he contributed his $108,000 of seed money to Diversified.

In May of 2009, Debtor told Atkisson he was having financial troubles. The draws from Diversified had stopped and Debtor was receiving no income from Diversified. Debtor told Atkisson he had to use the credit card for personal expenses. Debtor purchased $800 worth of gift certificates from Ruth Chris' Steakhouse for use in meetings with potential

-3-

clients. The evidence also showed that Debtor used the credit card for personal living expenses. Atkisson was aware of these charges. Once the seed money contributed by Debtor was gone, Atkisson personally paid the credit card bills on Debtor's behalf. Atkisson acknowledged that he agreed to pay these items. He told Debtor that the credit card bill was getting high and that he had to be judicious with his spending and use of the card. He did not tell Debtor to stop using the card.

On June 10, 2009, Atkisson sent Debtor an email severing their relationship. Neither the email nor anything else in writing references Debtor's alleged misuse of the Diversified credit card as the reason for the severance. Debtor testified that Atkisson told him the bill was getting high and to be careful with its use but he did not instruct him to discontinue use of the card nor did he ever demand the card's return from Debtor.

## **CONCLUSIONS OF LAW**

The Second Amended Complaint of Atkisson states two causes of action against Debtor. Plaintiff seeks to have Debtor's debt excepted from discharge pursuant to 11 U.S.C. §§523(a)(2)(A) and (a)(6). The Court finds that the Plaintiff's case falls short of necessary evidence to prove his claims under either theory.

Exceptions to discharge are narrowly construed. This furthers the Congressional policy favoring the provision of a fresh start for debtors. In re Finnegan, 428 B.R. 449 (Bankr. N.D. Ohio 2010). The party seeking to have a debt declared nondischargeable bears

the burden of proof by a preponderence of the evidence.  Grogan v. Garner, 498 U.S. 279 (1991).  In the case at bar, Plaintiff failed to meet his burden of proof.

In order to prove a debt is nondischargeable under 11 U.S.C. §523(a)(2)(A), the movant must show actual fraud, other than a statement respecting the debtor or an insider's financial condition.  These elements must be proven: (1) the debtor obtained the money through material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of the loss.  In re Rembert, 141 F.3d 277, 281 (6th Cir. 1998).  In support of this claim, Atkisson contends Debtor induced Atkisson to pay down his existing debts and that Diversified would gain income as a result.  Atkisson also contends that Debtor misused the company credit card for personal expenses.  The evidence presented by Atkisson in support of this claim does not meet the required elements of §523(a)(2)(A).

There is no evidence that Debtor obtained money through a material misrepresentation that he knew was false or made with gross recklessness.  Debtor's use of the corporate credit card was authorized by Atkisson.  Debtor admitted that he used the card to pay personal expenses but he informed Atkisson of this fact because he was not receiving a draw or income from Diversified.  Atkisson did not instruct him to stop using the credit card nor did he take the credit card back from Debtor.  In fact, once Atkisson decided to sever his business relationship with Debtor on June 10, 2009, misuse of the

company's credit card was not set forth in writing as one of the reasons for severing the business relationship.

The other material allegation that Atkisson used to support his claim under §523(a)(2)(A) was that Debtor misrepresented to Atkisson that if he paid down his debts Diversified would gain income.  The evidence established that Atkisson did pay down several of Debtor's debts in order for Debtor to close the sale of Commonwealth to Jessica Wagner.  Diversified's failure to succeed appears to be the real basis of Atkisson's fraud allegations.  The evidence, however, does not support any claim that Atkisson paid down the debts based on a misrepresentation by Debtor.  Atkisson testified that he willingly paid these debts in order to close the sale.  In return, Debtor put $108,000 of the sale proceeds, plus two installment payments of $5,669 each, into Diversified.  Debtor also contributed commissions as part of his capital contribution to Diversified.  While the company did not obtain the sales that both Atkisson and Debtor had hoped for, there is no evidence to support Atkisson's theory of nondischargeability based on misrepresentation.  Plaintiff simply failed to carry his burden of proof by a preponderance of the evidence on the elements required to succeed on a claim under 11 U.S.C. §523(a)(2)(A).

Atkisson's second claim is asserted under 11 U.S.C. §523(a)(6).  Under this Count, Atkisson alleges that any debt is nondischargeable due to it being a willful and malicious injury.  The debtor must actually intend the injury caused, not merely intend the act that causes the injury.  <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998).  Unless the "actor desires

to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it," a willful and malicious injury has not been committed as defined under 11 U.S.C. §523(a)(6). <u>In re Markowitz</u>, 190 F.3d 455, 464 (6th Cir. 1999). There was no evidence of an intentional and malicious injury as required by the statute. Atkisson's claim under §523(a)(6) also has no merit and fails for lack of evidence.

## **CONCLUSION**

For all of the above reasons, judgment in favor of Debtor/Defendant Anthony Roberts will be entered on the Complaint of Plaintiff James Atkisson.

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| IN RE: | |
| ANTHONY ROBERTS<br>ELITA ROBERTS | CAE NO.: 10-31154(1)(7) |
| <u>                            Debtors                         </u> | |
| JAMES ATKISSON | AP NO.: 10-03043 |
| Plaintiff | |
| vs. | |
| ANTHONY ROBERTS | |
| <u>                            Defendant                        </u> | |

**<u>JUDGMENT</u>**

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Judgment is entered in favor of Debtor/Defendant Anthony Roberts on the Complaint of Plaintiff James Atkisson.

This is a final and appealable Judgment. There is no just reason for delay.